UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case NO.: 10-20506-CIV-SEITZ/SIMONTON

<u>CONSENT CASE</u>

| | | |
|---|---|---|
| EDEL LEON, ANDRES GUZMAN, JAVIER GONZALEZ, VICTOR ANTONIO GUTIERREZ, MARCELINO MATEO | ) ) ) | |
| | ) | Case No. 10-20975-CIV-SEITZ/SIMONTON |
| Plaintiffs, | ) | Consent Case |
| | ) | |
| v. | ) | |
| | ) | |
| M.I. QUALITY LAWN MAINTENANCE, INC., MITCHELL'S LAWN MAINTENANCE CORP., and MITCHELL IGELKO, | ) ) ) | |
| | ) | |
| Defendants, | ) | |
| _____ | ) | |

<u>DEFENDANTS' MOTION FOR RELIEF FROM
FINAL JUDGMENT [D.E. 242] AND FOR SANCTIONS</u>

Defendants M.I. QUALITY LAWN MAINTENANCE, INC. (**"M.I. Quality"**), MITCHELL'S LAWN MAINTENANCE CORP. (**"Mitchell's Lawn"**), and MITCHELL IGELKO (**"Igelko"**) (collectively, the "**Defendants**"), pursuant to Federal Rules of Civil Procedure 60 and 62, and the case law cited herein, move this Court for Relief from the Final Judgment [D.E. 242] entered in favor of Plaintiff EDEL LEON (**"Leon"**) and against Defendants on February 28, 2013 (the **"Final Judgment"**), and for sanctions against Leon and Plaintiff Kelly Phillips (**"Phillips"**), and state the following as support:

**I.
BACKGROUND AND PROCEDURAL POSTURE**

On July 17, 2012, following a jury trial, the jury returned a verdict in favor of Leon on his retaliation claim pursuant to the Fair Labor Standards Act, 29 U.S.C. §§ 201 to 219, awarding him $22,900.00 in net loss of wages and benefits, as well as $25,000.00 for emotional pain and

mental anguish [D.E. 188].  Following the verdict, the Court awarded Leon liquidated damages equal to his net loss of wages and benefits ($22,900.00), for a total award to Leon of $70,800.00 [D.E. 241].

On March 11, 2013, Leon and his wife, Phillips, filed a separate, 23-count Complaint in the Southern District of Florida (1:13-cv-20854-FAM) against Mitchell's Lawn and Igelko for damages under theories of retaliation and slander [D.E. 1] (hereinafter the **"Defamation Complaint"**).[1]  The allegations in the Defamation Complaint are closely related to the present action with many of the allegations stemming from Defendants' alleged actions during this litigation.  While investigating the allegations of the Defamation Complaint, the undersigned conducted a witness interview of Mr. Lance Cooper because Leon and Phillips accused Igelko of slandering their good name, credit, and reputation by allegedly telling Mr. Cooper that "Phillips and Leon had stolen over 1 million dollars[,] . . . the employee files, and the time cards from Mitchell's Lawn."  (Defamation Complaint ¶ 41.)

On or about July 9, 2013, the undersigned reached out to Mr. Cooper's counsel requesting to speak with Mr. Cooper and asking if Mr. Cooper would be available for deposition. A true and correct copy of the electronic correspondence is attached as **Exhibit "A."**  After speaking with Mr. Cooper's attorney several times, Mr. Cooper's attorney indicated his client wanted to avoid the costs associated with a deposition and had Mr. Cooper produce any and all relevant records in his possession.  Also, Mr. Cooper agreed to execute an Affidavit, which was filed simultaneously with this Motion (the **"Cooper Affidavit"**).  The Cooper Affidavit also contains multiple composite exhibits in support of his sworn statements that will be referred to throughout this Motion.  The Cooper Affidavit and its exhibits are incorporated herein.

---

[1]        This case also has been transferred to The Honorable Andrea S. Simonton, and separate relief will be sought against Defendants in the Defamation case.

ESPINOSA | JOMARRON

TRIAL LAWYERS

As indicated in detail in the Cooper Affidavit, the interview of Mr. Cooper led to the shocking revelation that Leon and Phillips concocted and filed the instant lawsuit to <u>fraudulently</u> obtain the underlying Final Judgment [D.E. 242] in favor of Leon and against Defendants.

As will be explained in detail below, Defendants are entitled to relief from the Final Judgment [D.E. 242] because: (1) Phillips stated under oath that Leon was not receiving overtime at his new employment when, in fact, he was; (2) Leon and Phillips stated under oath that Leon was paying 100% of his health insurance at his new employment when, in fact, he was not; (3) Leon and Phillips stated under oath that it took Leon about three (3) months to find a new job when, in fact, it did not; (4) Phillips requested that Mr. Cooper pay Leon his overtime via separate checks—outside of payroll—so that if Defendants' attorneys contacted Mr. Cooper or requested documents from him, they would not discover that Leon was, in fact, receiving more compensation than what he was testifying to during his depositions, the jury trial in this case, and the bench trial on front wages; and (5) Phillips admitted to Mr. Cooper that Leon was <u>not</u> emotionally distressed by surveillance cameras and, instead, was only saying that to get more money awarded to him in the underlying lawsuit.

Accordingly, Defendants now ask this Honorable Court, due to Plaintiffs' fraud, misrepresentation, and misconduct: (1) to relieve Defendants of the Final Judgment [D.E. 242] as it applies to Leon, pursuant to Federal Rule of Civil Procedure 60(b)(3); (2) to stay the execution of the Final Judgment [D.E. 242] pending the disposition of the present motion, pursuant to Federal Rule of Civil Procedure 62(b)(4); and (3) to grant sanctions against Leon and Phillips, pursuant to this Honorable Court's inherent authority, requiring them to reimburse Defendants for all the attorneys' fees and costs incurred by them in defending the underlying litigation and for bringing these matters to the Court's attention.

## II.
## FACTS

The crux of Leon's retaliation claim in the instant action was that Defendants fired him for asserting a claim for overtime wages against Defendants and that Leon suffered damages in the way of back wages in the amount of $22,900.00 for the three (3) months Leon swore he was without work.  Throughout this case Leon offered four (4) steadfast arguments in support of his claim: (1) that Leon could not find work for three (3) months after being fired by Defendants; (2) that Leon now had to pay 100% of his insurance benefits; (3) that Leon no longer had the opportunity to work overtime; and (4) that Leon became emotionally distressed as a result of Defendants' surveillance cameras.  Phillips' testimony mirrored that of her husband's testimony, Leon—**even when directly questioned by this Court**.  The Cooper Affidavit not only rebuts these claims as falsehoods, but also demonstrates that from the inception of this lawsuit Leon and Phillips bolstered Leon's case through the use of fraud by making several perjurious statements during depositions and the course of the trials in this case.

Leon and Phillips perjured themselves during the following examinations:

- On July 13, 2010, during Leon's deposition (the **"Leon Deposition"**).  A true and correct copy of the Leon Deposition is attached as **Composite Exhibit "B."**

- On July 11, 2012, at trial, during Leon's direct examination by his attorney Jaime Zidell, Esq. (**"Leon's First Direct"**).  A true and correct copy of the portion of the trial transcript of Leon's First Direct pages 1–49 is attached as **Composite Exhibit "C."**

- On July 11, 2012, at trial, during the first part of Leon's cross examination by Defendants' attorney Daniel A. Espinosa, Esq. (**"Leon's First Cross"**).  A true and correct copy of the portion of the trial transcript of Leon's First Cross pages 49–107 is attached as **Composite Exhibit "D."**

- On July 12, 2012, at trial, during the second part of Leon's cross examination by Defendants' attorney Daniel A. Espinosa, Esq. (**"Leon's Second Cross"**).  A true and correct copy of the portion of the trial transcript of Leon's Second Cross pages 1–35 is attached as **Composite Exhibit "E."**

- On February 25, 2013, at a bench trial, during Phillips' direct examination by her attorney Jaime Zidell, Esq. (the **"Phillips Direct"**). A true and correct copy of the portion of the trial transcript of the Phillips Direct pages 19–23 is attached as **Composite Exhibit "F."**

- On February 25, 2013, at a bench trial, during Phillips' cross examination by Defendants' attorney Jesmany Jomarron, Esq. (the **"Phillips Cross"**). A true and correct copy of the portion of the trial transcript of the Phillips Cross pages 24–36 is attached as **Composite Exhibit "G."**

- On February 25, 2013, at a bench trial, during Leon's direct examination by his attorney Jaime Zidell, Esq., (**"Leon's Second Direct"**). A true and correct copy of the portion of the trial transcript of Leon's Second Direct pages 37–39 is attached as **Composite Exhibit "H."**

A.
LEON LIED ABOUT WAITING THREE (3) MONTHS BEFORE FINDING ANOTHER JOB

Leon stated under oath during his deposition and during his first direct examination that it

took him three (3) months to find another job.

```
13      When did you begin working with M.I.
14      Quality—I'm sorry, with Perrine?
15      A. Okay, approximately three months after
16      Mitchell terminated me.
17      Q. Okay, so it's your testimony that three
18      months after your -- After October 19th of 2009 you
19      became employed with Perrine?
20      A. It is like that.
21      Q. Mr. Leon, did you have any association
22      whatsoever with Perrine prior to the time that you told
23      us now?
24      No.
```

(Leon Dep. Ex. B, 21:13–24, July 13, 2010 (emphasis added).)

```
9       Q. How long did it take you before you actually obtained other
10      employment after Mitchell fired you?
11      A. Three months.
12      Q. During those three months, did you -- approximately how
13      many places did you visit looking for work during that time
14      period?
15      A. Almost all the body shops over there in Miami.
16      Q. And three months later you got another job?
17      A. Yes.
```

(Leon's First Direct Ex. C, 46:9–17, July 11, 2012 (emphasis added).)  Then, Leon maintained

the same story throughout his cross examination by Daniel A. Espinosa, Esq.

> 3   **A. Approximately three months after Mitch fired me, I started**
> 4   **working for Perrine.**
> 5   Q. Do you remember applying two to three days after you were
> 6   terminated from Mitchell's Lawn or M.I. Quality Lawn
> 7   Maintenance, applying to Perrine Rentals?
> 8   A. Yes.
> 9   **Q. What you're telling the ladies and gentlemen of the jury is**
> 10  **that it took them three months to hire you?**
> 11  **A. Yes.**
> 12  Q. Sir, are you sure it wasn't three weeks?
> 13  A. Can I explain to you the reason why I was hired?
> 14  Q. Sure, once you answer my question, you can explain whatever
> 15  you want.
> 16  **A. I applied later, but it took around three months to get the**
> 17  **job.**
> 18  Q. My question is, are you sure it didn't take three weeks?
> 19  A. Ah-ha, that's right.
> 20  **Q. Sir, what if I tell you that I have surveillance of you**
> 21  **working at Perrine Rentals after three weeks of your**
> 22  **termination of employment at M.I. Quality Lawn Maintenance?**
> 23  **A. I would be surprised.**
> 24  **Q. You would be surprised?**
> 25  **A. Yes.**

(Leon's Second Cross Ex. E, 9:3–25, July 12, 2012 (emphasis added).)

> 6   Q. After you were terminated from M.I. Quality Lawn, isn't it
> 7   a fact that you were collecting unemployment?
> 8   A. After Mitchell fired me, I applied for unemployment. It
> 9   took me a year for a lawsuit. After I won the lawsuit,
> 10  unemployment gave me the money.
> 11  **Q. They gave you money even though you were already working at**
> 12  **a different job; isn't that right?**
> 13  **A. I only claimed for the three months I was without a job.**

(Leon's Second Cross Ex. E, 16:6–13, July 12, 2012 (emphasis added).)[2]

In Paragraph 5 of the Cooper Affidavit, Mr. Cooper swears that Leon began working for

---

[2]   If Leon, in fact, collected unemployment benefits from the State of Florida, as he swore he did, then he improperly received said compensation because according to the Cooper Affidavit he was working for Best Vest Corporation d/b/a Perrine Rentals.

ESPINOSA | JOMARRON
TRIAL LAWYERS

Best Vest Corporation d/b/a Perrine Rentals (**"Perrine"**) the week of August 24, 2013—i.e., the week following Leon's termination date—which is not three (3) months later as Leon testified under oath numerous times.  Mr. Cooper's sworn statements contradict Leon's testimony in his deposition, his first direct examination, and his cross examination.  To support the Cooper Affidavit, Mr. Cooper provided the undersigned with a copy of Leon's Employment Application, which is attached to the Cooper Affidavit as Composite Exhibit "1."  Leon's Employment Application states that Leon can commence working as a small engine mechanic as soon as August 24, 2009, and that he actually started working on August 26, 2009.  (Cooper Affidavit, ¶ 5 and Ex. 1.)  Mr. Cooper also provided the undersigned with Perrine's bookkeeping records for every net payment received by Leon from September 2, 2009, through November 30, 2012 (**"Leon's Real Compensation List"**), which is attached to the Cooper Affidavit as Composite Exhibit "2."  As indicated in Leon's Real Compensation List, Leon received his first payment from Mr. Cooper on September 2, 2009, and weekly thereafter for the three (3) months he swore he was not working and could not find work, which proves that Leon lied under oath.

Leon also bolstered his false claim of not working for three (3) months by testifying under oath that during the three (3) months he was not working he lost about $8,000.00.

```
1      Q. Now, how much are you claiming that you've lost during
2      those three months as back wages from the moment that you were
3      fired until you found your next job?
4      A. Around $8,000.
5      Q. Is that for the 12 weeks that you were looking for work in
6      the interim period?
7      A. Yes.
```

(Leon's First Direct Ex. C, 48:1–7, July 11, 2012 (emphasis added).)  Leon's statement about losing about $8,000 also is false because Leon's Real Compensation List reveals that he was paid a <u>net</u> amount of $6,014.76 from August 26, 2009, through November 27, 2009—the three (3) months he was allegedly not working. (Cooper Affidavit, ¶ 16 and Ex. 2.)

ESPINOSA | JOMARRON
TRIAL LAWYERS

<u>B.</u>
<u>LEON LIED ABOUT NO LONGER BEING COMPENSATED FOR HEALTH INSURANCE</u>

Leon testified that his new job required him to pay his own health insurance. However, in paragraph 10 of the Cooper Affidavit, Mr. Cooper swears that he paid 100% of the portion of Leon's health insurance benefits attributable to a $1,500.00 deductible family plan. The following are excerpts of Leon's and Phillips' testimony wherein they maintain this fabrication. In the last excerpt, Phillips even lied directly to the Court in response to inquiry about this issue.

| | |
|---|---|
| 4 | Q. Okay. The new job that you got three months later, are you |
| 5 | still at that job today? |
| 6 | A. I hope so. I hope with this problem I don't lose my job. |
| **7** | **Q. From <u>three</u> months after Mitchell fired you until the trial,** |
| **8** | **you've been working at that same place, correct?** |
| **9** | **A. Yes.** |
| **10** | **Q. Okay. At your new job that you got three months after** |
| **11** | **Mitchell fired you, are you making the same wages, including** |
| **12** | **the insurance benefits that you had, as while you were employed** |
| **13** | **by Mitchell?** |
| **14** | **A. No.** |
| 15 | Q. In what way is it different? |
| 16 | A. I'm making $2 less per hour. |
| 17 | Q. So you're getting $18 an hour now? |
| 18 | A. Yes. |
| **19** | **Q. Do you get health benefits at this job that you got after** |
| **20** | **Mitchell fired you?** |
| **21** | **A. <u>I have to pay for it.</u>** |

(Leon's First Direct Ex. C, 47:4–21, July 11, 2012 (emphasis added).)

| | |
|---|---|
| **16** | **Q. And currently at the job that you have now, which is the one** |
| **17** | **that you had since late 2009, do you pay for your own health** |
| **18** | **insurance?** |
| **19** | **A. Yes, I paid [sic].** |
| **20** | **Q. <u>Have you always paid for your own health insurance</u> at the** |
| **21** | **current employer? [Perrine Rental/Best Equipment]** |
| **22** | **A. <u>Yes.</u>** |

(Leon's Second Direct Ex. H, 38:16–22, February 25, 2013 (emphasis added).)

| | |
|---|---|
| 11 | Q. And do you know whether Edel pays for his own insurance at the |
| 12 | company? |
| 13 | A. Yes, he pays for it himself now. |

14 Q. And has he always paid for his own health insurance since he
15 has been working for his current employer?
16 A. Yes.

(Phillips Direct Ex. F, 22:11–16, February 25, 2013)

18 THE COURT: I have a question. Do you know whether or not
19 his employer contributes to his health insurance payments? In other
20 words, some employers contributes part and the employee contributes
21 Part. Do you have knowledge of that?
22 THE WITNESS: ***Yeah. We pay 100 percent***, to my knowledge.

(Phillips Direct Ex. F, 23:18–22, February 25, 2013 (emphasis added).)

C.
PHILLIPS LIED TO BOLSTER LEON'S CLAIMS

Leon bolstered his false claims further with the testimony of Phillips.  Phillips added that she had personal knowledge of Leon's dealings with Mr. Cooper, that Leon did not start working for Mr. Cooper until three (3) months after he was fired by Defendants, that Leon only worked forty (40) hours for Mr. Cooper, and that Leon did not receive any additional compensation besides payment for forty (40) hours per week.

3 Q. You met with Mr. Leon's employer and talked about Mr. Leon's
4 salary, is that what you are testifying to?
5 A. If I talked to him regarding Edel making $18 an hour?
6 Q. Yes.
7 A. Yes.
8 Q. Okay. And tell me about that conversation. How did that
9 happen?
**10 A. When I very first met him.**
**11 Q. When did you first meet him?**
**12 A. Oh, after Mitchell fired Edel.**
**13 Q. How soon after?**
**14 A. I don't recall.**
15 Q. And what is his name?
16 A. Lance
17 Q. Lance what?
18 A. Cooper.
19 Q. Lance Cooper?
20 A. Yes.

(Phillips Cross Ex. G, 29:3–20, February 25, 2013 (emphasis added).)

– 9 –
ESPINOSA | JOMARRON
TRIAL LAWYERS

> 2 Q. How soon after Mr. Leon was fired did he start working at Best
> 3 Equipment or Perrine?
> 4 A. Sometime in November. **Three months after**.

(Phillips Cross Ex. G, 30:2–4, February 25, 2013 (emphasis added).)

> 16 Q. What was his position at Best Equipment and Perrine?
> 17 A. Small-engine mechanic.
> 18 Q. So he was offered a position as small-engine mechanic at $18 an
> 19 hour; is that correct?
> 20 A. That's what I remember, yes.
> **21 Q. And how many hours a week?**
> **22. A. He works 40 hours a week.**
> **23 Q. Does he ever work overtime at Perrine?**
> **24 A. No. Just 40 hours.**

(Phillips Cross Ex. G, 30:16–24, February 25, 2013 (emphasis added).)

> 4. Q. So you don't know if Mr. Leon is receiving additional
> 5. compensation that you're not aware of?
> 6. A. Well, I'm aware of what he receives on a weekly basis with his
> 7. check.
> **8. Q. Besides the check and besides that conversation, you don't know**
> **9. of anything else; isn't that right? You just testified to that.**
> **10. A. There is nothing else. He doesn't bring home anything else.**
> **11. Q. Well, that's what I'm asking you. You don't know if he's being**
> **12. paid cash for other jobs?**
> **13. A. Other jobs where, at Best Equipment?**
> **14. Q. Wherever.**
> **15. A. No, he comes home – He works. He does his job. <u>He get his</u>**
> **16. <u>paycheck for the hour he works, 40-hour week, $18 an hour. That's</u>**
> **17. <u>what he brings home. Nothing else</u>.**

(Phillips Cross Ex. G, 31:4–17, February 25, 2013) (emphasis added).

> **12 Q. Isn't it true Mr. Leon already had found employment at Perrine**
> **13 at this time and was trying to get fired?**
> **14 A. <u>No</u>.**
> 15 Q. Isn't it true that he went and he started disrespecting
> 16 everybody in the office trying to get fired?
> 17 A. No.

(Phillips Cross Ex. G, 36:12–17, February 25, 2013 (emphasis added).)

The foregoing testimony by Phillips also is contradicted by the Cooper Affidavit, wherein

– 10 –

ESPINOSA | JOMARRON

TRIAL LAWYERS

Mr. Cooper swears in paragraph 9 that "[t]here was rarely a pay period that Leon did not work at least five (5) extra hours of overtime . . . ."  Mr. Cooper added in paragraph 8 of the Cooper Affidavit that:

> Phillips was very adamant about the way Leon was to receive all of his compensation while working for my companies. She insisted that I put the overtime in a supplemental check outside of payroll so it would appear as if Leon was making less money with my company, which Phillips told me would somehow help her and Leon in their lawsuit against Mitchell.

Mr. Cooper's sworn statements are supported by Leon's Real Compensation List, which shows a common payment to Leon of $135.00 representing five (5) hours of overtime most weeks.

Finally, paragraphs three (3) through five (5) indicate that Leon was interviewing to work for Mr. Cooper as early as August 10, 2009.  On or about August 17, 2009, Leon had a final interview for Perrine and accepted Mr. Cooper's offer to work there—this is two (2) days before Leon was allegedly terminated in retaliation by Mr. Igelko.  These facts are consistent with Defendants' and their witnesses testimony to the Court that Leon was not retaliated against and instead concocted and instigated his firing by offending his co-workers and Mr. Igelko's family.

D.
LEON LIED ABOUT HIS MENTAL ANGUISH DUE TO CAMERAS

Leon proceeded with his charade by testifying that surveillance cameras caused him mental anguish and thereby increased the damages demanded from the jury.

```
20     Q. You're claiming mental anguish in this lawsuit for being
21     terminated; are you not?
22     A. Well, since he fired me, the whole sky fell on me.
23     Q. Explain to me how the sky came falling down on Edel Leon.
24     A. Well, I ended up without a job, without any security. My
25     wife has to go to the doctor constantly. It was only after

1      three months that I started working, and you know, I need to
2      work and I, myself, have to pay for insurance.
3      Q. Sir, is that the only mental anguish that you're claiming?
4      A. Well, that's one of them.
```

5    Q. Tell me the rest.

**6    A. Well, they only asked me to work at his bigger company, and**
**7    I told him that I was working in the small one because that one**
**8    didn't have a camera so that I wouldn't be observed the whole**
**9    time. Every time I see a camera, I feel like I'm being**
**10   observed the whole time.**

11   Q. Are you also suffering from insomnia, sir?

12   A. Yes.

13   Q. Because you think there are cameras watching you, sir?

14   A. I feel constantly being observed and that my phone
15   conversations are being heard, that I'm being, like, monitored.

16   Q. Wouldn't you agree that people who steal should be worried
17   about, that they should be looking over their shoulder,
18   shouldn't they? In fact, they shouldn't even be sleeping?

19   A. When I was working at the company, as I said, on the second
20   floor, the ceiling had metal lines, and that way the camera
21   that was installed on the second floor was constantly watching
22   where I was going or where I was working.
23   According to him, when it took me longer to repair a
24   piece of equipment, he would call the office, and the office
25   would tell me that I needed to go talk to him. He would tell
1    me, "It seems to me that you're taking too long with that piece
2    of equipment, and I want to know why."
3    I would tell him, "You don't realize that at the same
4    time that I'm taking care of this piece of equipment I'm also
5    seeing what this other guy needs, the ones that just came in."

**6    That's one of the reasons why I'm so afraid of cameras.**

7    Q. But you want the ladies and gentlemen to believe, as you
8    testified on direct, that you wanted to stay at this company in
9    which you were being monitored the whole time. You wanted to
10   retire there.

11   A. That's the way it was.

12   Q. Were you suffering from insomnia while you were working
13   there?

14   A. No.

15   Q. But weren't the cameras on you nonstop?

16   A. Yes, they have always been there.

17   Q. So it was when you got fired that you missed the cameras
18   and you got insomnia?

19   A. No, but whenever I would get there in the morning, he knew
20   everything that he had to tell me what to do, because he had
21   already checked through the cameras whatever things he didn't
22   like.

23   Q. But you still wanted to retire there knowing all of this;
24   is that not correct?

25   A. I had already taken all of that as a natural thing.

ESPINOSA | JOMARRON

TRIAL LAWYERS

(Leon's First Cross Ex. D, 87:20–89:25, July 11, 2012 (emphasis added).)

| 10 | Q. If the cameras scared you as Mitchell watched your every |
|---|---|

10   Q. If the cameras scared you as Mitchell watched your every
11   move, why is it that the insomnia arose after you left?
12   A. Well, at least while I was working for the company I was
13   making money. I was paying my bills, and I had health
14   insurance for me, my children, and my wife.
15   Q. So now it has nothing to do with the cameras?
16   A. I don't understand the question.
17   Q. Well, not having the job for three months is what caused
18   you all of this mental anguish?
19   A. Well, when I was fired from the job is when all of this
20   happened, when you feel all of this on top of you. While it's
21   happening, you leave this as a natural thing.
**22   Q. But the cameras were largely responsible for your insomnia?**
**23   A. In part.**
**24   Q. And the rest was not having a job for three months?**
**25   A. Yes.**

(Leon's First Cross Ex. D, 90:10–25, July 11, 2012 (emphasis added).)  In paragraph 19 of the Cooper Affidavit, Mr. Cooper swears that Phillips told him jokingly that her attorney was claiming emotional distress for Leon because of a purported issue Leon has with video cameras. Then, Mr. Cooper swears that Phillips requested Leon to be placed in Mr. Cooper's smaller store because there were no cameras there and that would help their case against Defendants.

**II.**
**MEMORANDUM OF LAW**

**A.**
**THE FINAL JUDGMENT [D.E. 242] SHOULD BE SET ASIDE PURSUANT**
**TO RULE 60(B)(3) DUE TO LEON'S AND PHILLIPS' FRAUD,**
**MISREPRESENTATIONS, AND MISCONDUCT**

Leon obtained a favorable jury verdict against Defendants by perpetrating a fraud upon this Court, and the interests of justice require that the Final Judgment [D.E. 242] be set aside.

Federal Rule of Civil Procedure 60(b) provides in pertinent part that:

> On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons:
>
> . . . .

– 13 –

ESPINOSA | JOMARRON
TRIAL LAWYERS

(3) fraud (whether previously called intrinsic or extrinsic),
misrepresentation, or misconduct by an opposing party . . . .

Such a motion "must be made within a reasonable time . . . and no more than a year after the

entry of the judgment or order or the date of the proceeding." F.R.C.P. 60(c)(1).  In determining

whether a Rule 60(b) motion was filed within a reasonable time after the entry of judgment,

courts routinely look to whether the movant acted with due diligence.  *Armstrong v. The Cadle*

*Co.*, 239 F.R.D. 688, 692 (S.D. Fla. 2007).  Although the granting of such relief is within the

discretion of the trial court, the rule is remedial and should be liberally construed. *See Hand v.*

*United States*, 441 F.2d 529 (5th Cir. 1971); *Atchison, T. & S.F. Ry. Co. v. Barrett*, 246 F.2d 846,

849 (9th Cir. 1957).

To obtain relief from a final judgment based upon fraud under a Rule 60(b)(3) motion, a

movant must satisfy the following conditions:

> First, the movant must demonstrate by clear and convincing
> evidence that her opponent committed fraud or engaged in some
> other form of misconduct. Second, she must show that the alleged
> misconduct prevented her from making a "full and fair"
> presentation of her case.

*Harduvel v. Gen. Dynamics Corp.*, 801 F. Supp. 597, 607 (M.D. Fla. 1992).  Further, Rule

60(b)(3) motions are "aimed at judgments which were unfairly obtained, not at those which are

factually incorrect."  *Rozier v. Ford Motor Co.*, 573 F.2d 1332, 1339 (5th Cir. 1978) (emphasis

added).  Therefore, the middle district succinctly held:

> Most courts agree that a movant need *not* demonstrate that the
> result of the former proceedings would be different in order to
> show that she was precluded from a full and fair hearing. . . . [A
> defendant] need only show that she was prevented from fully and
> fairly presenting her case or, otherwise put, that the new evidence
> would have allowed her to re-shape her case.

*Harduvel*, 801 F. Supp. at 607–08. "[W]hile admissibility is not a sine qua non for granting relief

under Rule 60(b)(3) where the wrongful withholding of information during discovery is alleged,

it may be a relevant factor in weighing the prejudice suffered by the moving party." *Rozier*, 573 F.2d at 1343.

Two instances where litigants may exhibit fraud are through discovery violations and perjured testimony.  In *Rozier*, a plaintiff sought certain documents through interrogatories and included the documents within a discovery order; however, defendant falsely stated that he was unable to locate the document. *Id.* at 1339.  The Court granted plaintiff's Rule 60(b)(3) motion and held that defendant's misconduct prejudiced plaintiff by denying her information that might well have reshaped the case she ultimately presented to the jury.  In so holding, the court explained that "[i]nstead of serving as a vehicle for ascertainment of the truth, the trial in this case accomplished little more than the adjudication of a hypothetical fact situation imposed by [defendant's] selective disclosure of information."  *Id.* at 1346.  Similarly, in *Harduvel*, a plaintiff alleged misconduct based on representations contained in defendant's perjured testimony. 801 F. Supp. at 613.  The court noted that a Rule 60(b)(3) motion is proper "where material information has been withheld or incorrect or perjured evidence has been intentionally supplied." *Id.*

In the instant case, Leon and Phillips have timely filed this Motion because it is within one (1) year from the entry of the Final Judgment [D.E. 242]—i.e., February 28, 2013.  Further, it was brought within a reasonable time because Defendants only discovered the facts cited herein during their discovery of the allegations in the recently filed Defamation Complaint and have acted with due diligence since said discovery to verify the accuracy of all the information discovered before presenting it to this Court.

Now, Defendants provide this Court with clearly convincing evidence that Leon and Phillips were fully aware that they were perpetrating a fraud upon this Court and Defendants. Because of Leon's and Phillips' perjured testimony, this Court should relieve Defendants of the

ESPINOSA | JOMARRON

TRIAL LAWYERS

Final Judgment Leon fraudulently obtained against them pursuant to Rule 60(b)(3) and award Defendants attorneys' fees and costs as sanctions against Leon and Phillips for their bad-faith litigation pursuant to this Court's inherent authority.  As we now know, Leon's and Phillips' actions made it impossible for Defendants to make a full and fair presentation of their case because their lies went directly to the heart of this case.  Accordingly, Leon and Phillips should not be allowed to receive any benefits stemming from their intentional fraud.

The Cooper Affidavit makes it abundantly clear that Leon and Phillips invented this lawsuit for the purpose of stealing thousands of dollars from Igelko and his companies.  Their goal was to make it appear as if Leon's firing was a retaliatory measure when in reality this was an elaborately crafted scheme whereby Leon already secured a job <u>before</u> Igelko terminated him, and then <u>intentionally</u> became insubordinate, disrespectful, and vulgar in order to get himself fired for the sole purpose of adding a retaliation claim to his lawsuit.  Incidentally, Leon, Phillips, and the remaining Plaintiffs all lost their overtime claims against Defendants; however, Leon and Phillips perpetrated a fraud upon the undersigned, the jury, and even this Honorable Court by using their perjured testimony to inflate Leon's back wages claim.

In fact, Leon's and Phillips' perjured testimony was the sole difference between a successful claim and a defense verdict, as evidenced by the $22,900.00 that the jury awarded Leon for back wages and the $25,000 he was awarded for emotional pain and mental anguish.  In computing Leon's alleged damages for back wages, the jury took into consideration the $2 per hour salary reduction Leon sustained after being fired by Defendants as well as his alleged loss of health insurance benefits.  Indeed, counsel for Leon made this a feature of his closing argument as follows:

> Therefore, his total overtime claim is for $17,940. He's also claiming the amount that he would have made from the date that he was fired until the present date. **Remember, he got a new job**

> **about three months after he was fired**, but he gets paid $2 less
> an hour. He's making $18 an hour without insurance. If you add up
> all of his insurance benefits and the differential in wages between
> $20 an hour that he was making at Mitchell's, had he continued
> working at 46.5 hours a week and not been fired when he did, **his
> total back wage claim would be $22,900, and that's if you give
> him his benefits and insurance and the differential between the
> $20 an hour and $18 an hour that he's now making. That's in
> addition to the emotional damages**.

(Plaintiffs' Closing Argument, 23:17–24:5 (emphasis added).)

Notably, the jury was spoon-fed the information from Plaintiffs' counsel based on Leon's fraudulent testimony throughout the trial.[3] Further, the emotional pain and suffering damages were due in large part to Leon's manifestation of paranoia, insomnia, and sudden fear of cameras. The Cooper Affidavit debunks these fraudulent claims. Simply put, Leon's verdict would not have been obtained but for Leon's and Phillps' perjured testimony; and, at the very least, the undersigned was prevented from fully and fairly presenting Defendants' case and evidence that would have enabled the undersigned to re-shape the defense strategy of this trial.

Based on the foregoing, this Court should stay the execution of the fraudulently obtained Final Judgment [D.E. 242] until the issues in this present motion have been resolved. Federal Rule of Civil Procedure 62(b) provides in pertinent part that:

> On appropriate terms for the opposing party's security, the court
> may stay the execution of a judgment—or any proceedings to
> enforce it—pending disposition of any of the following motions:
> . . . .
> (4) under Rule 60, for relief from a judgment or order.

Accordingly, because this motion is being filed pursuant to Rule 60(b)(3), and Defendants' have presented sufficient evidence of Leon's and Phillips' fraud, a stay also is justified.

---

[3]     The undersigned is not suggesting Plaintiffs' counsel was aware of Leon's fraud.

– 17 –

ESPINOSA | JOMARRON

TRIAL LAWYERS

B.
### THE COURT SHOULD IN ITS INHERENT AUTHORITY AWARD SANCTIONS AGAINST LEON AND PHILLIPS

In addition to setting aside the Final Judgment [D.E. 242] pursuant to Rule 60(b)(3), this Court also, pursuant to its own inherent authority, may relieve Defendants of a fraudulent final judgment as well as sanction Leon and Phillips.  "Federal courts have the inherent power to manage their own proceedings and to control the conduct of those who appear before them." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 33 (1991).  "[T]he inherent power also allows a federal court to vacate its own judgment upon proof that a fraud has been perpetrated upon the court." *Chambers*, 501 U.S. at 44 (citing *Hazel–Atlas Glass Co. v. Hartford–Empire Co.*, 322 U.S. 238 (1944)).  "Moreover, a court has the power to conduct an independent investigation in order to determine whether it has been the victim of fraud." *Chambers*, 501 U.S. at 44 (citing *Universal Oil Products Co. v. Root Ref. Co.*, 328 U.S. 575, 580 (1946)).

Sanctions are appropriate against a party who litigates in bad faith and perpetrates a fraud upon the court. *Chambers*, 501 U.S. at 44–51.  "Although the 'American Rule' prohibits the shifting of attorney's fees in most cases, an exception allows federal courts to exercise their inherent power to assess such fees as a sanction when a party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Id.* (citing *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 258–59 (1975)).  Similarly, sanctions also are warranted against a party that disrupts litigation or practices a fraud upon the court. *Universal Oil*, 328 U.S. at 580.

A federal judge's inherent power to award sanctions is derived from the Court's need "to manage its own affairs so as to achieve the orderly and expeditious disposition of cases." *Chambers*, 501 U.S. at 42. "While the other sanction mechanisms only reach certain individuals or conduct, 'the inherent power extends to a full range of litigation abuses' and 'must continue to exist to fill in the interstices.'" *Peer v. Lewis*, 606 F.3d 1306, 1314 (11th Cir. 2010) (quoting

*Chambers*, 501 U.S. at 46). "Indeed, the inherent power of a court can be invoked even if procedural rules exist which sanction the same conduct, for these rules are not substitutes for the inherent power." *Id.* (citation and internal quotations omitted). "'But if in the informed discretion of the court, neither the statute nor the Rules are up to the task [of imposing sanctions], the court may safely rely on its inherent power' to sanction bad faith conduct in the course of litigation." *Id.* (quoting *Chambers*, 501 U.S. at 50 and citing *Shepherd v. Am. Broadcasting Cos.*, 62 F.3d 1469 (D.C. Cir. 1995)). "When rules alone do not provide courts with sufficient authority to protect their integrity and prevent abuses of the judicial process, the inherent power fills the gap." *Shepherd*, 62 F.3d at 1474.

The Eleventh Circuit has explained that "the key to unlocking a court's inherent power is a finding of bad faith." *Barnes v. Dalton*, 158 F.3d 1212, 1214 (11th Cir. 1998). District courts may assess attorneys' fees and costs against the client or his attorney, or both, when either has "acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Bryne v. Nezhat*, 261 F.3d 1075, 1106 (11th Cir. 2001) (quoting *Chambers*, 501 U.S. at 45–46). Neither Federal Rule 11 nor Section 1927 of Title 28 displaces the inherent power of a district court to impose sanctions for bad-faith conduct. *Chambers*, 501 U.S. at 49. If a litigant's conduct is sanctionable, and the conduct that is sanctionable under a rule or statute is intertwined with conduct that is sanctionable only under the court's inherent power, the court need not first apply the rule or statute to discrete violations before it can invoke its inherent power. *Id.*

Based on the examples fraud, misrepresentation, and misconduct exhibited by Leon and Phillips during this litigation, this Court also should exercise its inherent authority to award sanctions against Leon and Phillips in favor of Defendants by striking their pleadings in the instant lawsuit and awarding Defendants all of the attorneys' fees and costs they incurred in defending Leon's and Phillips' claims as well as bring this matter to the Court's attention.

– 19 –

ESPINOSA | JOMARRON

TRIAL LAWYERS

WHEREFORE, Defendants, M.I. QUALITY LAWN MAINTENANCE, INC., MITCHELL'S LAWN MAINTENANCE CORP., and MITCHELL IGELKO, respectfully requests that this Honorable Court:

a.      Relieve Defendants' of the fraudulently obtained Final Judgment [D.E. 242];

b.      Award sanctions against Plaintiffs Leon and Phillips, including but not limited to, compensating Defendants for having to incur attorneys' fees and costs because of the fraud;

c.      Refer Leon and Phillips to the proper authorities for consistently perjuring themselves and using the judicial system as a conduit to defraud Defendants;

d.      Inform Florida's Office of Workforce Innovation that Leon collected unemployment for a period of time that he was working and earning money;

e.      Stay the execution of the Final Judgment until the disposition of the present motion;

f.      Enter an Order setting an evidentiary hearing on the instant Motion, requiring Leon and Phillips to produce all of their bank statements for all accounts for the relevant time period; and

g.      Grant such further relief this Court deems just and proper.

Respectfully submitted,

By:     /s/ Daniel A. Espinosa
        Daniel A. Espinosa, Esq.
        Florida Bar No.: 81686
        despinosa@ejtrial.com
        Jesmany Jomarron, Esq.
        Florida Bar No.: 69165
        ESPINOSA | JOMARRON
        *Counsel for Defendants*
        4300 Biscayne Blvd., Ste. 1500
        Miami, Florida 33137

**[CERTIFICATE OF GOOD-FAITH CONFERENCE AND
CERTIFICATE OF SERVICE ON NEXT PAGE]**

– 20 –
ESPINOSA | JOMARRON
TRIAL LAWYERS

### CERTIFICATE OF GOOD FAITH CONFERENCE; CONFERRED BUT UNABLE TO RESOLVE ISSUES PRESENTED IN THE MOTION

Pursuant to Local Rule 7.1(a)(3)(A), I hereby certify that counsel for the movant has conferred with all parties or non-parties who may be affected by the relief sought in this motion in a good faith effort to resolve the issues but has been unable to resolve the issues.

By:    /s/ Daniel A. Espinosa
Daniel A. Espinosa, Esq.

### CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that a true and correct copy of this document was served via CM/ECF this 4th day of December, 2013, upon: Jamie H. Zidell, Esq. and Daniel Feld, Esq., 300 71st Street, Suite 605, Miami Beach, Florida 33141, zabogado@aol.com, danielfeld.esq.@gmail.com, and all other counsel of record.

By:    /s/ Daniel A. Espinosa
Daniel A. Espinosa, Esq.