Page 1

1            UNITED STATES DISTRICT COURT
             SOUTHERN DISTRICT OF FLORIDA
2

        CASE NO. 09-22243-CIV-SEITZ/O'SULLIVAN
3

4

5
                                              ORIGINAL
RUBEN RODRIGUEZ MELGAR, EDEL LEON,
6  etc. et al.,
7                 Plaintiffs,
8         v.
9  M.I. QUALITY LAWN MAINTENANCE, INC.,
   MITCHELL'S LAWN MAINTENANCE CORP.,
10 and MITCHELL IGELKO,
11                Defendants.
   - - - - - - - - - - - - - - - - -x
12
13
                         300 71st Street
14                       Suite 605
                         Miami Beach, Florida
15                       July 13, 2010
                         10:45 a.m. - 12:40 p.m.
16
17
18
                 DEPOSITION OF EDEL LEON
19
20
21
22         Taken before Melanie Simon, Certified
23  Shorthand Reporter and Notary Public for the State of
24  Florida at Large, pursuant to Notice of taking.
25  Deposition filed in the above cause.

```
 1                    APPEARANCES
 2          ISAAC MAMANE, ESQ. of the firm of
            LAW OFFICE OF J.H. ZIDELL, 300 71st
 3          Street, Miami Beach, Florida 33141, on
            behalf of the plaintiffs.
 4
            CARMEN RODRIGUEZ, ESQ., of the firm of
 5          LAW OFFICES OF CARMEN RODRIGUEZ, P.A.,
            15715 South Dixie Highway, Miami, Florida
 6          33157, on behalf of the Defendants.
 7          ALSO PRESENT:
            Anita Aviles
 8          Adriana Igelko
            Kelly Phillips
 9
10          _____
11
12
13
                     I  N  D  E  X
14
         Witness     Direct  Cross  Redirect  Recross
15
      Edel Leon         3       --       --        --
16
17
18
                     E X H I B I T S
19
20     Defendant's                        For Ident.
21       1 (signature)                     Pg. 5
         2 (signature)                     Pg. 28
22
23
24
25
```

Page 3

1    Thereupon--

2                    SANDRA FRANCO

3    was duly sworn to truly and faithfully perform the

4    duties of interpreter, translating from English to

5    Spanish and Spanish to English.

6    Thereupon--

7                    EDEL LEON

8    was called as a witness by the defendants and, having

9    been first duly sworn, testified  as follows:

10                   DIRECT EXAMINATION

11   BY MS. RODRIGUEZ:

12        Q.    Mr. Leon, my name is Carmen Rodriguez.  I

13   represent the defendant in the lawsuit that you filed.

14   I am going to ask you questions this morning relating

15   to your claim.  If at any time you cannot hear or you

16   do not understand my question, it's important that you

17   tell us that.  Otherwise, if you answer the question

18   you will be deemed to have understood it.

19             As you sit here today, is there any reason

20   why you are unable to provide truthful and complete

21   testimony?

22        A.    Ask me the question again.

23             (Thereupon, the pending question was read

24   back by the court reporter as above recorded.)

25             THE WITNESS:  I say the truth.

Page 4

```
 1   BY MS. RODRIGUEZ:

 2        Q.   Now, Mr. Leon, you have requested a

 3   translator for your deposition today, correct?

 4        A.   Yes.

 5        Q.   And that is based on your representation

 6   to us that you could not speak the English language.

 7        A.   I don't understand much.

 8        Q.   Now, you are married?

 9        A.   Yes.

10        Q.   How long have you been married?

11        A.   A year and about two weeks.

12        Q.   Who are you married to?

13        A.   Kelly Phillips.  Now, Kelly Leon.

14        Q.   Your wife was previously Kelly Phillips,

15   correct?

16        A.   Yes.

17        Q.   And you're telling us that you have been

18   married officially for the last year?

19        A.   Yes.

20        Q.   And prior to officially marrying Miss

21   Phillips, the two of you were significant others

22   involved in a relationship, correct?

23        A.   As dating, yes.

24        Q.   And does Miss Phillips speak Spanish?

25        A.   No.
```

Page 5

1          Q.     Let me understand your testimony today.

2                 Miss Phillips does not speak Spanish and

3     you do not speak English?

4          A.     I speak English but not very well.

5          Q.     Okay, Mr. Leon, before we go any further

6     let me ask you, please, if you could take a pen and let

7     me ask you to sign your name and the court reporter

8     will mark it.

9                 Mark this as Exhibit 1.

10                (Thereupon, the document referred to was

11    marked as Defendant's Exhibit No. 1 for

12    Identification.)

13    BY MS. RODRIGUEZ:

14         Q.     All right; are you on any medication this

15    morning that you have been advised would prevent you

16    from being aware and answering questions?

17         A.     No.

18         Q.     When were you employed with Mitchell's?

19         A.     When I began or when?

20         Q.     What was the name of the employer that you

21    are suing?  What is your understanding of your

22    employer's corporate name?

23         A.     Mitchell Igelko, M.I. Quality.  That is

24    the company where I worked, and Mitchell's Lawn

25    Maintenance.

1       Q.     My question is by whom were you employed?

2       A.     I worked for Mitchell, and the company

3    M.I. Quality.   The owner is Mitchell.

4       Q.     I appreciate that.

5              I am asking you a very simple question.   I

6    am not asking you who the owner is.   I'm asking you the

7    name of your employer.

8       A.     The one who hired me, employed me was

9    Mitchell.

10      Q.     Your testimony today is you were not an

11   employee of M.I. Quality, is that correct?

12      A.     I was employed by Mitchell and later it

13   changed to M.I..

14      Q.     So is it your testimony that you were

15   employed individually by Mitchell in his own name or

16   through a corporation, Mr. Leon?

17      A.     He gave me the opportunity to work a job

18   in the company, Mitchell's Lawn Maintenance.

19      Q.     Okay, so there we go.

20             So for a period of time you were employed

21   by Mitchell's Lawn Maintenance?

22      A.     Yes, it is like that.

23      Q.     What years were you employed by Mitchell's

24   Lawn Maintenance?

25      A.     I began around February 1997.

Page 7

1          Q.      When did you stop being an employee of

2    Mitchell's Lawn Maintenance?

3          A.      He changed me to the other company.

4          Q.      What date?

5          A.      I don't know.

6          Q.      Your testimony is that at some point you

7    began to be an employee of M.I. Quality?

8          A.      Um-hum, yes.

9          Q.      When?

10         A.      I don't have exactly the date when he

11   opened that company.

12         Q.      Approximately when?

13         A.      Approximately between five and eight years

14   ago.

15         Q.      So is it your testimony this morning that

16   for the last five to eight years of your employment you

17   were employed by M.I. Quality?

18         A.      It's an approximate answer.

19         Q.      But a truthful approximation?

20         A.      Approximately I have been working for the

21   company, I would say, for the last four years.

22         Q.      So it's not five to eight years anymore?

23         A.      You asked me approximately.

24         Q.      And you told me approximately five to

25   eight years.

Page 8

1          A.    Okay, then say approximately six years.

2          Q.    Mr. Leon, unfortunately your English

3    skills are showing through.

4                You have asked for a translator and you

5    need to let the translator translate because you have

6    asked us for one.

7          A.    Yes.

8          Q.    When were you --

9                You are suing M.I. Quality as your

10   employer, are you not?

11         A.    Yes.

12         Q.    And it's a very simple question, then

13   because you are suing them.

14               When were you employed by M.I. Quality,

15   Mr. Leon?

16         A.    Okay, five years ago.

17         Q.    And when you began to be employed by M.I.

18   Quality, you began to receive health insurance,

19   correct?

20         A.    For that reason he opened that company; he

21   transferred to that company.

22         Q.    So the answer to my question is when you

23   became employed by M.I. Quality you began to have

24   health insurance?

25         A.    Yes.

Page 9

```
 1          Q.    What was your understanding about who
 2    was -- who M.I. Quality paid for in terms of health
 3    insurance coverage, sir?
 4          A.    The company paid it.
 5          Q.    Who was insured from you and your family
 6    through M.I. Quality's insurance to you?
 7          A.    At the beginning, me and the children.
 8          Q.    Okay, so you were insured, correct?
 9          A.    Yes.
10          Q.    At no cost to you, correct?
11          A.    No.
12          Q.    You told me about your children.  How many
13    children?
14          A.    Three.
15          Q.    What are their ages currently?
16          A.    Ten, eight, and two.
17          Q.    What are their names, the ten year old?
18          A.    Emily Leon.
19          Q.    And the eight year old?
20          A.    Faith Leon.
21          Q.    And the two year old?
22          A.    Daniel Leon.
23          Q.    During the time you were employed with
24    M.I. Quality, did Emily, Faith and Daniel live with
25    you?
```

1      A.     Yes.

2      Q.     Did Emily Leon have insurance coverage

3  paid for by M.I. Quality?

4      A.     Yes.

5      Q.     Did Faith Leon have insurance paid for by

6  M.I. Quality?

7      A.     Yes.

8      Q.     Did Daniel Leon have insurance paid for by

9  M.I. Quality?

10     A.     Yes, he did.

11     Q.     Did you tell Mr. Igelko that all three of

12 your children were on the health insurance policy paid

13 for by M.I. Quality, Mr. Leon.

14     A.     He asked me for their names so he could

15 put them on the policy.

16     Q.     Did M.I. Quality pay for health insurance

17 benefits for anyone else in your family, sir?

18     A.     Later I was with Kelly so it was a

19 complete family.

20     Q.     When did Kelly join your policy?

21     A.     She was on her policy.  She worked in that

22 company.

23     Q.     So Miss Phillips also received health

24 insurance paid for by M.I. Quality during her time of

25 employment, correct?

Page 11

1     A.     Yes.

2     Q.     Let's go back to yours and your children.

3            I understand your testimony that during

4     the time you were employed with M.I. Quality you and

5     the three children you have identified received health

6     insurance benefits provided for by M.I. Quality at no

7     cost to you, correct?

8     A.     That is how it is.

9     Q.     When did Kelly Phillips join your family

10    plan?

11    A.     I am not sure because I don't handle the

12    office stuff.

13    Q.     Miss Phillips did that, correct?

14    A.     I don't know if at that present time she

15    was the one that would do that.

16    Q.     Certainly at some point in her employment

17    she did that, didn't she, Mr. Leon?

18    A.     Really, I don't know.  I wasn't in the

19    office.

20    Q.     So it's your testimony today that you have

21    no knowledge whatsoever as to what your wife did at

22    M.I. Quality, correct?

23           MR. MAMANE:   Objection.

24    BY MS. RODRIGUEZ:

25    Q.     You can answer.

Page 12

1          A.    No.

2          Q.    Did Kelly Phillips join your family plan

3    before you were married?

4          A.    She was on the company insurance.

5          Q.    I appreciate that.   That is not the

6    question.

7                (Thereupon, the pending question was read

8    back by the court reporter as above recorded.)

9                THE WITNESS:   I really couldn't tell you

10               because I never checked the documents.

11   BY MS. RODRIGUEZ:

12         Q.    Okay, Mr. Leon, when was your last date of

13   employment with M.I. Quality?

14         A.    When Mitchell released me in October

15   approximately 19th.

16         Q.    What year, sir?

17         A.    '09, last year.

18         Q.    Based on your testimony this morning, for

19   the five years, approximately, prior to October of 2009

20   you were employed by M.I. Quality, correct?

21         A.    Yes, approximately.

22         Q.    And prior to that through February of 1997

23   you were employed by Mitchell's Lawn Maintenance,

24   correct?

25         A.    Correct.

Page 13

1      Q.    Do you have, Mr. Leon, any notes, any

2   calendars or any records relating to your employment

3   with M.I. Quality?

4      A.    Written?  I really don't have anything.

5      Q.    Do you have any records whatsoever, Mr.

6   Leon, that you maintained regarding your hours of work?

7      A.    No, that was the company's duty.  There

8   were time cards.

9      Q.    I'm not asking you what the company's

10  duties are.  I am asking you, Mr. Leon, if you kept any

11  record of your hours of work.

12     A.    No.

13     Q.    Do you have any notes, calendars or

14  records of any kind relating to the allegations of your

15  complaint?

16     A.    No.

17     Q.    All right, going to the year of 2009, what

18  were your job duties?

19     A.    Mechanic.

20     Q.    Were there two other employees in your

21  department?

22     A.    A mechanic that worked with the trucks in

23  like the warehouse and his helper.

24     Q.    So the answer to my question is, yes,

25  there were two other mechanics in your department?

1       A.     Yes.

2       Q.     What were their names in 2009?

3       A.     Manuel was the helper.  I don't recall the

4  other one's name right now.

5       Q.     Starting from 2009 -- well, strike that.

6              From 2006 to 2009 in the mechanics'

7  department, isn't it true there was always you and two

8  other employees?

9       A.     In the company, yes.

10      Q.     Isn't it true, sir, you had the title of

11 head mechanic?

12      A.     No.

13      Q.     So you have never represented in any

14 writing that you were head mechanic of M.I. Quality?

15      A.     No.

16      Q.     So if you ever represented in any document

17 that you were head mechanic, that was a lie?

18      A.     I am a mechanic.  I was the only one.

19      Q.     Mr. Leon, did you have the title of head

20 mechanic at M.I. Quality?

21      A.     That I knew of, no.

22      Q.     And your testimony is you have never

23 represented yourself as head mechanic of M.I. Quality,

24 right?

25      A.     That is how it is.

Page 15

1    Q.    And if there is ever a writing, if there
2    is any writing where you represented yourself as head
3    mechanic, that would be a lie, right?
4    A.    It is like that.
5    Q.    Okay, for the period 2006 through 2009,
6    what was your work schedule?
7    A.    Supposedly from 10:30 to 7:00.
8    Q.    What days of the week?
9    A.    Monday through Friday.
10    Q.    What were your periods for lunch or
11    breaks?
12    A.    I would never take them.
13    Q.    My question is, did you have an allotted
14    time for lunch, Mr. Leon?
15    A.    They would not give it to me.
16    Q.    So it's your testimony today that you
17    agreed to a work schedule of 10:30 to 7:00 with no
18    breaks?
19    A.    No, I did not agree to that.
20    Q.    When your hours of work were set, what was
21    your understanding of your work schedule?
22    A.    My understanding is what he told me, 15
23    minutes in the morning, 30 minutes in the afternoon and
24    15 minutes more in the afternoon.
25    Q.    Was your work schedule the same from 2006

Page 16

1    to 2009?

2         A.    No, that kind of changed.

3         Q.    Let's start with 2006.

4               What was your understanding of your hours

5    of work?  What were they supposed to be in the year

6    2006?

7         A.    They would tell me I had work to do until

8    the job was over.

9         Q.    When were you supposed to be at work, Mr.

10   Leon?

11        A.    10:30.

12        Q.    Mr. Leon, isn't it true for 2006 your

13   hours of work were to be 10:30 to 7:00?

14        A.    They were always changing the hours.

15        Q.    How did you know when to come to work if

16   nobody told you what your hours of work were, sir?

17               You're letting that English come through.

18   You have to wait for your translator.

19        A.    My schedule was from 10:30 until the job

20   was over.

21        Q.    When did it become 10:30 to 7:00?

22        A.    In the last two-and-a-half to three years.

23        Q.    All right; what were your job duties?

24        A.    My job was mechanic.

25        Q.    Specifically were there any particular

Page 17

1    types of equipment that you were responsible for?

2         A.    The small equipment for mowing lawns.

3         Q.    Was your schedule the same as the lawn

4    men?

5         A.    No, they started in the morning.

6         Q.    They started earlier than you, correct?

7         A.    Yes.

8         Q.    And the whole point, Mr. Leon, why you

9    started at 10:30 was for you to be able to see the

10   equipment before the end of the day when the men

11   returned, correct?

12        A.    I would start at 10:30 because all the

13   equipment that arrived that would not function, I would

14   repair them, so the following day they would be ready

15   for the morning.

16        Q.    How did you maintain your hours of work

17   while employed with M.I. Quality?

18        A.    With a time card.

19        Q.    Where were the time cards maintained?

20        A.    Under the clock.

21        Q.    Physically where was that located?

22        A.    Next to the office, next to the water

23   fountain.

24        Q.    Was this true for the period 2006 through

25   2009?

Page 18

1       A.      Yes.

2       Q.      So you were directed to punch the time

3    clock for your hours of work with M.I. Quality,

4    correct?

5       A.      That is so.

6       Q.      And you did that?

7       A.      Always.

8       Q.      And you did that truthfully and correctly?

9       A.      Correctly, I did.

10      Q.      So your testimony is that your time card

11   correctly represented the hours that you worked?

12      A.      Well, I would work those hours.  I would

13   punch and mark them, but then he would later say, "I

14   only pay 40 hours.  I don't care the hours that you

15   worked."

16      Q.      So it's your testimony that your time

17   cards correctly reflect the hours that you, in fact,

18   worked?

19      A.      It is like that.

20      Q.      And then your testimony is that Mr. Igelko

21   would tell you he is paying 40 hours?

22      A.      He did not care.

23      Q.      Did you punch in and out for the 15

24   minutes that you took in the morning?

25      A.      That is not really true.  I really never

Page 19

1    took the 15 minutes.

2         Q.    When you took the time for lunch, did you

3    punch in and out?

4         A.    I was told, "Don't even punch it because I

5    am not going to give you any time."

6         Q.    Who is telling you that?

7         A.    Mitchell.

8         Q.    Mitchell wasn't in the mechanic's shop

9    with you, was he, Mr. Leon?

10        A.    The mechanic department is far from where

11   the cards are, the time clock.

12        Q.    Mr. Leon, isn't it true that Mr. Igelko

13   was out on the road during the workday and was hardly

14   either in the office or in your mechanic's shop, sir?

15        A.    That is correct.

16        Q.    All right, so it's your testimony -- I

17   want to make sure I understand it -- that you did not

18   ever take a lunch break during the five years that you

19   were employed with M.I. Quality?  You went from 10:30

20   to whenever and never took a lunch break?

21        A.    I would take my lunch time.

22        Q.    And my question is, would you punch in and

23   out when you did that?

24        A.    He told me "You don't need to punch out.

25   You don't need to register the time."

1      Q.    Okay, I understand.

2            Mr. Leon, have you ever gone by any other

3   name?

4      A.    No.

5      Q.    What is your full name?

6      A.    Edel.

7      Q.    Is there a middle name?

8      A.    No.

9      Q.    What is your date of birth?

10      A.    February 28, 1964.

11      Q.    Where do you currently reside?

12      A.    I have to get my wallet.  I don't know my

13   address.

14      Q.    Go ahead.

15      A.    13831 southwest 154th Court.

16      Q.    How long have you resided at that address?

17      A.    I would say around two years.

18      Q.    During the five years or so that you

19   worked with M.I. Quality, did you work anywhere else?

20      A.    There was a period of time that I left for

21   two months.  Mitchell asked me to come back; "Pretend

22   that you never took off that time."

23      Q.    Thank you, but that doesn't answer my

24   question.

25            During the five years that you worked with

Page 21

1    M.I. Quality, did you ever have any other employment?

2         A.    No.

3         Q.    Have you ever been employed with Perrine

4    Rentals and Best Equipment and Repair?

5         A.    That is where I am working now.

6         Q.    Let me make sure.  Let me go back to the

7    other question and make sure we are clear.

8              While you were working with M.I. Quality,

9    did you ever work simultaneously anywhere else?  In

10   other words, was there ever a time when you had two

11   jobs?

12        A.    No.

13        Q.    When did you begin working with M.I.

14   Quality -- I'm sorry, with Perrine?

15        A.    Okay, approximately three months after

16   Mitchell terminated me.

17        Q.    Okay, so it's your testimony that three

18   months after your -- After October 19th of 2009 you

19   became employed with Perrine?

20        A.    It is like that.

21        Q.    Mr. Leon, did you have any association

22   whatsoever with Perrine prior to the time that you told

23   us now?

24        A.    No.

25        Q.    Are you paid cash by Perrine?

Page 22

1          A.     No.

2          Q.     Would you know why there would be pictures

3    of you with their uniform two or three days after you

4    left M.I. Quality?

5          A.     I doubt it.

6          Q.     I want to make sure.  There would be no

7    reason whatsoever for you to be wearing the Perrine,

8    Best Equipment Uniform a few days after the termination

9    of your employment with M.I. Quality, correct?

10         A.     I didn't have work with them.

11         Q.     And there would be no reason why you would

12   be at their workplace a few days after the separation

13   of your employment with M.I. Quality?

14         A.     I went to different places looking for

15   employment.

16         Q.     Did you go a few days after you were

17   separated from M.I. Quality to Perrine?

18         A.     I went to apply for a job.

19         Q.     Did they have you put on their uniform to

20   test it out or anything?

21         A.     No.

22         Q.     So it's your testimony that a few days

23   after your separation from M.I. Quality you completed

24   an employment application with Perrine Rental and Best

25   Equipment?

Page 23

1          A.     I went to apply.

2          Q.     And you completed an application?

3          A.     I went and spoke to the owner.  He told me

4    he would call me later.

5          Q.     Did you complete an application, sir?

6          A.     No, I didn't fill out an application.

7          Q.     Okay, let's go back now to the five years

8    with M.I. Quality.

9                 We talked earlier about your insurance

10   benefits.  Those insurance benefits became effective

11   when you became employed with M.I. Quality, correct?

12         A.     That is so.

13         Q.     Beginning in 2009 -- let's start with the

14   year 2009 -- what was your rate of pay?

15         A.     $20.00 per hour.

16         Q.     This is in 2009?

17         A.     Yes.

18         Q.     And in 2008 what was your rate of pay?

19         A.     I believe it was the same.

20         Q.     Did your rate of pay ever change during

21   the time you were employed with M.I. Quality?

22         A.     I believe so.

23         Q.     When was that?

24         A.     I would say approximately the last two or

25   three years it was like $20.00 an hour.

Page 24

1      Q.      How were you paid by M.I. Quality?

2      A.      Checks.

3      Q.      Explain to me the procedure of how you

4  received your paycheck.

5      A.      They would give me a company check.

6      Q.      M.I. Quality, correct?

7      A.      M.I. Quality, that is what the check said.

8      Q.      Now, you told me you did time cards?

9      A.      It is so.

10     Q.      Do you know who compiled your hours of

11  work?

12     A.      Mitchell.

13     Q.      Did you ever see Mitchell compile your

14  hours of work, Mr. Leon?

15     A.      When he would write something on the card,

16  it was his handwriting.

17     Q.      Like what?

18     A.      I would tell him, "Look, I have worked for

19  you more hours," and then he would write some

20  stupidity.

21     Q.      Who physically handed you your check?

22     A.      Sometimes the secretary that would be on

23  the floor before departing or sometimes it was just

24  left there in a folder with all the checks.

25     Q.      Isn't it true that Kelly Phillips did the

Page 25

1    payroll for M.I. Quality, sir?

2         A.    That, I couldn't tell you because I don't

3    work in the office.

4         Q.    If Miss Phillips admitted to doing the

5    payroll for M.I. Quality, you would have no evidence to

6    deny that, correct?

7         A.    I don't know anything about that.

8         Q.    So it's your testimony that during your

9    employment with M.I. Quality you received a paycheck?

10        A.    Yes.

11        Q.    And your paycheck was supposed to be for

12   the entire amount owed to you for wages?

13        A.    Supposedly for all the hours that I

14   worked.

15        Q.    Other than your paychecks, did you ever

16   have reason to receive any other checks from M.I.

17   Quality?

18        A.    No.

19        Q.    Other than the paycheck from M.I. Quality

20   did you ever have any reason to receive any other

21   paycheck in the five years that you were employed with

22   M.I. Quality or Mitchell's Lawn Maintenance?

23        A.    The Christmas bonus.

24        Q.    Other than that, Mr. Leon, other than your

25   regular payroll check you had no reason to receive any

Page 26

1    other check from M.I. Quality, correct?

2         A.    Yes, I did have a reason.

3         Q.    Okay, what is that reason?

4         A.    If somebody needed to be paid he said,

5    "Pay them in cash and I will pay you back."

6         Q.    Why would you have money?

7         A.    Because I have my money.

8         Q.    So it's your testimony that you had on you

9    hundreds of dollars at any one time to pay a payroll

10   check?

11               MR. MAMANE:   Objection.

12               THE WITNESS:   The guys make like $50.00,

13        two days of work.   It's not hundreds of dollars.

14   BY MS. RODRIGUEZ:

15        Q.    Who did you pay their wages to in cash?

16        A.    I didn't pay anybody.

17        Q.    I missed something then, Mr. Leon.

18               You told us that you were told to pay

19   employees in cash.   Did I misunderstand?

20        A.    I didn't say some employees.

21        Q.    What did you say?

22        A.    Like if he fired some employee and he

23   would come back to pick up his check, his payment, he

24   didn't want to give the money, he would say "If you

25   have the money give it to him and I will give you the

Page 27

1    check later."

2          Q.    What was the employee?

3          A.    Which was the employee?  Some guys that

4    didn't even work there; just one or two days.

5          Q.    All right, Mr. Leon, let's go with that.

6                So it's your testimony, then, that there

7    might be checks to you in the amount of maybe $50.00 or

8    $100.00 to reimburse an occasional employee?

9          A.    It's like that.

10         Q.    Did you have check signing authority?

11         A.    Yes.

12         Q.    So it's your testimony that you had check

13   signing authority but you didn't supervise anybody,

14   right?

15         A.    It's like that.

16         Q.    Okay, let's talk about your check signing

17   authority.

18               During what period of time did you have

19   check signing authority?

20         A.    Like a year when I started working and he

21   brought a document from the bank, that I would sign so

22   they would have records at the bank, and when I signed

23   the check it would clear the bank.

24         Q.    Is that within the year of your employment

25   with M.I. Quality?

Page 28

1          A.     No, about a year when I was working with

2     Mitchell's Lawn Maintenance.

3          Q.     It's your testimony that you had check

4     signing authority from approximately 1997?

5          A.     Around that year.

6          Q.     And continuing through 2009?

7          A.     Yes, it is.

8          Q.     Mr. Leon, was the check signing authority

9     to sign your name or to sign the name of Mitchell

10    Igelko?

11         A.     It's an authorization for my signature for

12    the company.

13         Q.     It's your testimony that you had an

14    authorized signature for --

15         A.     Yes.

16         Q.     I would like you, please, to take this

17    paper and write the signature that you testified you

18    were authorized to sign.  What is that authorized

19    signature?

20                Go ahead, please.

21         A.     It's been so long that I haven't done

22    that.

23                Something like this.

24                (Thereupon, the document referred to was

25    marked as Defendant's Exhibit No.  2, for

1  Identification.)

2  BY MS. RODRIGUEZ:

3        Q.    Let me make sure I understand.

4              Exhibit 2, pretty much this scribble

5  here -- you have to admit this is pretty much a

6  scribble -- is the signature that you wrote to the bank

7  for your check signing authorization?

8        A.    It's like that.

9        Q.    And, Mr. Leon, that was supposed to be

10 your check signing authorization, right?

11       A.    Mitchell gave me the authority to sign

12 this way the checks.

13       Q.    Mr. Leon, you told us you actually signed

14 bank documents to allow you to sign -- to have check

15 signing authority for the company, did you not?

16       A.    The document had my signature to be taken

17 to the bank, so when that signature would go through on

18 a check it would be accepted.  It would clear.

19       Q.    And the point was that it was to be your

20 signature, correct?

21       A.    No, that is scribble.

22       Q.    Let's look at this because this is kind of

23 interesting.

24              Exhibit 2, that is not your signature, is

25 it?

Page 30

1      A.     No, that is one I created to sign the

2   checks for the company.

3      Q.     Exhibit 1 is your signature?

4      A.     That is my signature.

5      Q.     Exhibit 2, you told us, is a signature

6   that you, quote, created?

7      A.     Mitchell told me, "Sign, but don't sign

8   your name.  Do something else," and that is what I did.

9      Q.     Mr. Leon, was the purpose of Exhibit 2 for

10  you to falsify the signature of Mitchell Igelko?

11     A.     It's that his signature wasn't like that.

12     Q.     Did you sign bank documents giving you,

13  Edel Leon, the authority to sign documents on behalf of

14  M.I. Quality, sir?

15          MR. MAMANE:  I am having a problem with

16       that translation.  I'm sorry.

17          Let's repeat the answer.

18          (Thereupon, the pending question was read

19  back by the court reporter as above recorded.)

20          THE WITNESS:  No, it was not to falsify.

21  BY MS. RODRIGUEZ:

22     Q.     It's your testimony that you created a

23  signature other than your true signature?

24     A.     When he brought me the paper he said "Do

25  not write your name, your first name and last name.  Do

Page 31

1    something else," and that is what I did.

2         Q.    Okay, and so Exhibit 2 is your -- the

3    signature that you used to sign checks, issue checks

4    for M.I. Quality?

5         A.    When I started that I was not working for

6    M.I. Quality.

7         Q.    Good correction.  It started in 1997,

8    didn't it, Mr. Leon?

9         A.    Around approximately.

10        Q.    And so beginning in 1997 and continuing to

11   2009, you used Exhibit 2, the signature, to issue

12   checks on behalf of either Mitchell's Lawn Maintenance

13   or M.I. Quality?

14        A.    When he would call me and tell me to sign

15   a check, I would sign the check.

16        Q.    So your testimony is that Mr. Igelko was

17   there but asked you to come and sign the check?

18        A.    He wasn't at the office.  He would call me

19   when the COD came in and some parts needed to be left

20   there, so I would sign the check.

21        Q.    Were you authorized to sign checks to

22   yourself?

23        A.    No.

24        Q.    Were you authorized to sign checks to

25   Kelly Phillips?

Page 32

1    A.    No.

2    Q.    Were you authorized to sign checks to any

3    other employee?

4    A.    Only when he would call me to tell me to

5    sign them for him.

6    Q.    Did you ever sign any check to yourself?

7    A.    No.

8    Q.    Did you ever sign any check to Kelly

9    Phillips?

10   A.    No.

11   Q.    Would there be any reason, Mr. Leon, why

12   there would be checks to Kelly Phillips signed by you?

13   A.    No.

14   Q.    Would there be any reason why there would

15   be checks to Kelly Phillips endorsed by you?

16   A.    I don't understand.

17   Q.    Do you understand what "endorsed" means?

18   A.    Change?

19   Q.    No; sign the back of the check.

20   A.    I don't recall.

21   Q.    But certainly it is your testimony that

22   you never signed any check from either of those

23   companies to Kelly Phillips?

24   A.    That I know of, no.

25   Q.    And nobody would know except you, right?

Page 33

```
1        A.    It's like that.
2        Q.    What bank did M.I. Quality use?
3        A.    I don't know.
4        Q.    When you were asked to complete bank
5    documents -- you told us Mitchell brought you bank
6    documents -- what bank was it?
7        A.    It was a bank that is on 8th on the left
8    side.
9        Q.    What is the name of the bank?
10       A.    I don't recall.
11       Q.    Explain to us on what occasion you would
12   have reason to issue checks with the signature on
13   Exhibit 2 for either of the two companies?
14       A.    What do you mean?
15       Q.    Give us an explanation of what
16   circumstances you were signing checks for either M.I.
17   Quality or Mitchell's Lawn Maintenance?
18       A.    When he would leave, many times he
19   wouldn't sign the checks, and when I was taking my
20   lunch he would tell me during that time, "Go ahead and
21   sign the checks for me."
22       Q.    What kind of checks?
23       A.    Just like things that he would buy, like
24   tools, sometimes some payroll for the employees or
25   someone that would go pick up a check.
```

Page 34

1       Q.      Like what?

2       A.      He would call me and say, for example, "My

3   wife is going to go by there.  Sign a check."

4       Q.      Sign a check for what?

5       A.      He just told me just sign her a check and

6   that's it.

7       Q.      So you did payroll checks?

8       A.      No.

9       Q.      From time to time you would be called upon

10  to sign payroll checks?

11      A.      Sometimes.

12      Q.      The two other mechanic employees that were

13  there, did they have check signing authority?

14      A.      That I know of, no.

15      Q.      Did they receive health insurance?

16      A.      That I know of, no.

17      Q.      And from time to time, if the other two

18  employees needed to be disciplined or separated, you

19  would recommend that, isn't that true?

20      A.      No.

21      Q.      So if there are any former mechanic

22  employees who said you fired them --

23      A.      No.

24      Q.      It's your testimony that you had

25  absolutely no responsibility over the other employees,

Page 35

```
 1    the other two mechanic employees?

 2         A.    It is like that.

 3         Q.    Did you have keys?

 4         A.    I had keys to close up.

 5         Q.    Did the other two employees have keys to

 6    close up?

 7         A.    The prior mechanic did have.

 8         Q.    The prior mechanic to what, sir?

 9         A.    Well, there have been so many mechanics in

10    the company.  Gil Gonzalez also had keys.

11         Q.    Did you give it to him?

12         A.    Mitchell gave it to him just like he gave

13    it to me.

14         Q.    Let's talk about your keys.

15               When did you receive keys?

16         A.    That, I don't remember.

17         Q.    Did you have keys during your entire

18    employment with M.I. Quality?

19         A.    Yes, the last five years I did have.

20         Q.    What were your keys for?

21         A.    To close the mechanic door and the outside

22    key.

23         Q.    Did you also have any security

24    information?

25         A.    When it was time to close up the warehouse
```

Page 36

1    I had to put the alarm code.

2         Q.    And you knew that?

3         A.    Yes.

4         Q.    Did you have keys to the office?

5         A.    No.

6         Q.    But Miss Phillips did, didn't she?

7         A.    I don't know.  I couldn't tell you.

8         Q.    Does the mechanic part of the mechanic

9    work area connect to the office?

10        A.    Yes.  Mine, no.

11        Q.    But your mechanic keys were for all the

12   work areas involving mechanics, isn't that true, Mr.

13   Leon?

14        A.    Yes.

15        Q.    Including the part of the mechanic area

16   that was adjacent to the office?

17        A.    The mechanic trucks, yes.

18        Q.    So you had the alarm code, the outside

19   gate and the mechanic work areas adjacent to the

20   office, true?

21        A.    Yes, that is true; just like the other

22   mechanic.

23        Q.    With the access that you have identified,

24   you had complete access to the work area, didn't you?

25        A.    Of course, because I would work late,

Page 37

1    continue working.

2         Q.    And this time that you stayed working was

3    beyond the work time of any other employee, right?

4         A.    Well, since Mitchell would say, "Go,

5    because that truck is going to come in later," later

6    I'll go open and I'll let them in.

7         Q.    Was that an exception?

8         A.    It would happen sometimes.

9         Q.    That was not the regular course, was it?

10         A.    No, usually I would have to wait for them

11    to come in.

12         Q.    Did you ever request to be paid part of

13    your wages in cash?

14         A.    No.

15         Q.    Were part of your wages ever paid in cash?

16         A.    Sometimes he did.

17         Q.    Tell me when you were paid in cash, sir.

18         A.    When he paid me in cash?  Whenever he

19    decided.

20         Q.    Let me go back to the last question.  I

21    want to make sure I understood.

22              It's your testimony that on a regular

23    basis you stayed until the last truck came in, correct?

24         A.    Yes, I would stay late.

25         Q.    That is the whole point why you had the

Page 38

1    keys, correct?

2         A.    Yes, I did, as well as the other mechanic.

3         Q.    And this other mechanic was employed at

4    the same time you were?

5         A.    Yes.

6         Q.    But to the best of your knowledge the

7    other mechanic didn't have check authorization?

8         A.    No.

9         Q.    And did not have health insurance?

10        A.    It is like that.

11        Q.    You told me previously about a period of a

12   couple months where you were not employed with either

13   of the two companies.

14        A.    I was not employed by either one of the

15   two.

16        Q.    What period of time was that?  When did

17   you leave?

18        A.    Mitchell terminated me around October

19   19th.

20        Q.    No, perhaps you misunderstood.

21              Between 1997 and 2009 was there ever a

22   time period where you were not employed were either of

23   the two companies?

24        A.    Oh, no.

25        Q.    It's your testimony that you were

Page 39

1    continuously employed?

2         A.    By Mitchell.

3         Q.    All right, let's go back to the paid in

4    cash.

5               How often were you paid in cash?

6         A.    I really can't assure you.

7         Q.    But it's your testimony today that there

8    were periods in your employment with M.I. Quality where

9    you were paid in cash?

10        A.    No, sometimes would he pay me in cash, I

11   believe, when I was working with Mitchell's Lawn

12   Maintenance.

13        Q.    So it's your testimony, sir, you were

14   never paid cash while employed with M.I. Quality?

15        A.    That I recall, no.

16        Q.    Now, sir, you joined an existing lawsuit

17   initially filed by Mr. Melgar, correct?

18             MR. MAMANE:  That is not correct.  The

19        translator said "you initiated a complaint."

20             (Thereupon, the pending question was read

21   back by the court reporter as above recorded.)

22             THE WITNESS:  It is like that.  I became

23        part of the lawsuit.

24   BY MS. RODRIGUEZ:

25        Q.    For purposes of these questions, I am not

Page 40

1    asking you any conversations that you had with your

2    attorneys.

3              How did you learn about the lawsuit Mr.

4    Melgar filed?

5         A.   Mitchell started screaming in the company

6    that that gentleman was filing a lawsuit against him

7    because he owed him money.

8         Q.   Did you ever meet with any current or

9    former employees to encourage them to join this

10   litigation?

11        A.   No.

12        Q.   So if there are persons who witnessed you

13   in the vicinity of the workplace meeting employees,

14   would that be true?

15        A.   Yes.

16        Q.   What was the purpose of the meeting, Mr.

17   Leon?

18        A.   They called me and asked me about the

19   lawsuit.

20        Q.   And you and Miss Phillips went to the

21   vicinity of the premises to encourage employees to join

22   the litigation?

23        A.   It's not like that.

24        Q.   Explain to me how it was, then.

25        A.   Some of the guys called me so I would

Page 41

1    explain how it is, and that was all.

2         Q.    When was that?

3         A.    After Mitchell terminated and I became

4    part of the lawsuit, he made such a scandal in the

5    company that the guys themselves began to call me.

6         Q.    So if employees testified that you were

7    harassing them at their workplace, would that be true?

8         A.    No.

9         Q.    Did you initiate phone calls to the cell

10   phones of any employees of Mitchell's?

11        A.    No.

12        Q.    Do you have a cell phone number?

13        A.    Yes.

14        Q.    What is it?

15        A.    I don't know it.

16        Q.    You don't know your cell phone number?

17        A.    I don't know it.

18        Q.    Do you have it with you?

19        A.    Yes.

20        Q.    Check your phone number.

21        A.    I don't know how to check it.

22              MS. RODRIGUEZ:  Counsel, can I ask you to

23        assist him to check his cell phone number?

24              MR. MAMANE:  No, we will provide it

25        afterwards.

Page 42

1    BY MS. RODRIGUEZ:

2         Q.    It's going to show up right on your

3    screen.

4              MS. PHILLIPS:  Would you like the number?

5              MR. MAMANE:  305-898-9366.

6    BY MS. RODRIGUEZ:

7         Q.    Who is your cell phone provider?

8         A.    AT&T.

9         Q.    How long have you had this cell phone with

10   AT&T?

11        A.    I would say two years.

12             MS. RODRIGUEZ:  The court reporter has

13        asked for a five minute convenience break.

14        (Thereupon, a discussion was held off the

15   record.)

16   BY MS. RODRIGUEZ:

17        Q.    Mr. Leon, I want to make sure first that I

18   understand.  I think I either wrote it down wrong or

19   you said it wrong.  When was your last day of

20   employment?

21        A.    October 19th.

22        Q.    Are you sure that it wasn't August?

23        A.    Okay, August.

24        Q.    So just to make sure we are clear, your

25   last day of employment with M.I. Quality was on or

Page 43

1    about August 19th, 2009?

2         A.    Yes.

3         Q.    Okay, let's go back briefly on the issue

4    of the keys.

5               Did you also have keys to access the

6    bedrock area?

7         A.    No.

8         Q.    Was there a property adjacent to where the

9    office is and mechanic shop?

10        A.    You are talking about bedrock?

11        Q.    Yes.

12        A.    It's not right there.

13        Q.    Other than the keys you have already told

14   me about, did you have keys to any other property

15   belonging to the business or belonging to Mr. Igelko?

16        A.    No.

17        Q.    Did you have keys to the windows?

18        A.    To the window, no.

19        Q.    For the shutters, sir?

20        A.    The shutters, yes.

21        Q.    You had keys for the shutters for the

22   complete property, correct?

23        A.    There is only two shutters.

24        Q.    So your testimony is you had keys to two

25   shutters?

Page 44

| | | |
|---|---|---|
| 1 | A. | Yes. |
| 2 | Q. | Where were they? |
| 3 | A. | At the entrance. |
| 4 | Q. | Is there a door in between the two |

sections of the property?

| | | |
|---|---|---|
| 6 | A. | Yes. |
| 7 | Q. | And you had keys to that, as well, did you |

not?

| | | |
|---|---|---|
| 9 | A. | Yes. |
| 10 | Q. | Do you know what the bedrock is? |
| 11 | A. | Yes. |
| 12 | Q. | What was the bedrock area? |
| 13 | A. | Where they would store the rocks, trees |

and stuff of landscaping.

| | | |
|---|---|---|
| 15 | Q. | How did you get into that area? |
| 16 | A. | When I would arrive at 10:30 that was |

already open.

| | | |
|---|---|---|
| 18 | Q. | That area is gated off separately from the |

rest of the property, is it not?

| | | |
|---|---|---|
| 20 | A. | Yes, it's a separate property. |
| 21 | Q. | And your testimony is you did not have a |

key to access the gate to that area?

| | | |
|---|---|---|
| 23 | A. | I didn't have a key to that area. |
| 24 | Q. | After your separation from employment, did |

you have occasion to be in the bedrock area?

Page 45

1      A.      No.

2      Q.      Did you ever, after your termination of

3   employment, did you ever meet with employees of either

4   company in that bedrock area?

5      A.      That I recall, no.

6      Q.      After your separation from employment in

7   August of 2009, were you authorized to be on the

8   property of the workplace?

9      A.      I never went back.

10     Q.      That is not my question.

11             Were you authorized to be there?

12     A.      No.

13     Q.      Let's go back to your check signing

14   authority.

15             Let me show you, again, Exhibit 2.  Was

16   that signature created by you to be similar to the

17   signature of Mitchell Igelko?

18     A.      No.

19     Q.      Why did you pick that?

20     A.      That is the one I did.

21     Q.      Who told you to make a signature other

22   than your own?

23     A.      Mitchell told me.  "Don't sign like you

24   sign.  Sign in another form," and I did it that way.

25     Q.      Was this intended to be in any way like

Page 46

1    the signature of Mr. Igelko?

2         A.    Mitchell didn't sign that way.

3         Q.    Would there be any reason, during your

4    employment, why you signed checks made out to cash?

5         A.    He left me checks to sign and I signed the

6    checks that he left for me.

7         Q.    Were some of those checks made out to

8    cash?

9         A.    I believe so.

10        Q.    For the period 2008 and 2009, did you have

11   a bank account?

12        A.    Yes.

13        Q.    With what bank?

14        A.    I believe American.

15        Q.    American Bank?

16        A.    I don't know many of the banks.

17        Q.    So you don't know where you had a bank

18   account?

19        A.    I think they are called Bank of America.

20        Q.    How long have you had your --

21              That is an account into which you would

22   accept deposits?

23        A.    Yes, I would deposit or my wife would

24   deposit the check.

25        Q.    By your "wife," you mean Miss Phillips?

Page 47

```
 1        A.     That's it.
 2        Q.     So you had a bank account with Bank of
 3   America in 2008 and 2009?
 4        A.     Yes.
 5        Q.     Did you have a bank account in Bank of
 6   America in 2006 and 2007?
 7        A.     I believe so.
 8        Q.     Mr. Leon, how many of the checks made out
 9   to cash that you signed with the signature on Exhibit 2
10   did you cash to yourself?
11        A.     None.
12        Q.     What did you do with the checks to cash
13   after you signed them?
14        A.     That is what I would leave to pay the
15   employees.
16        Q.     Your testimony was that you were -- that
17   you signed them, they were left for you and you signed
18   them?
19        A.     That is what it is.
20        Q.     What did you do after you signed them?
21        A.     To leave them to the secretary who was
22   there.
23        Q.     Who was that?
24        A.     There is just so many secretaries.
25   Yalene, Mitchell's mother, Luisa; the other secretaries
```

Page 48

1    that have worked there.

2         Q.    Mitchell's mother was at the workplace

3    also?

4         A.    Well, lately she was the one that was

5    finishing out the checks.

6         Q.    Was is lately?

7         A.    I would say the last two or three years.

8         Q.    So is it your testimony that from 2007 to

9    present you had no check signing authority with the

10   company?

11        A.    I have always had.

12        Q.    And you continued to sign checks with the

13   signature on Exhibit 2 through 2009 when you were

14   separated from employment, correct?

15        A.    I remember shortly before Mitchell

16   terminated me I never signed any checks.

17        Q.    What does "shortly before" mean?

18        A.    Since his mother began working there it

19   was more sporadically that he would leave checks for me

20   to sign.

21        Q.    Let me make sure that I understand.

22              Your testimony is that Mitchell's mother,

23   Elsa, began to be at the workplace two to three years

24   before you were separated?

25        A.    It is like that.

Page 49

1    Q.    And it's your testimony, then, that

2  beginning from 2007 --

3              Was it 2007 or 2006 that she began to be

4  there?

5    A.    Like around 2006.

6    Q.    So it's your testimony, Mr. Leon, that

7  beginning in 2006 continuing to your separation

8  Mitchell was no longer asking you to sign checks for

9  either of his companies?

10    A.    He would ask me sporadically, just not

11  continuously.

12    Q.    Is your testimony that his mother, Elsa,

13  took over that function?

14    A.    What function?

15    Q.    Of signing checks.

16    A.    It was my understanding he also gave her

17  authority to sign.

18    Q.    Were you present?

19    A.    No, but he told me.

20    Q.    What did he tell you?

21    A.    He told me that his mom, that she was

22  going to be like in charge of everything.  If anything,

23  just to speak with her.

24    Q.    So based on your testimony, from 2006 to

25  2009 we should see very few checks bearing your

Page 50

1    signature as in Exhibit 2, is that your testimony?

2         A.    Yes; not as much as before.

3         Q.    Did you have access to the checkbook?

4         A.    No.

5         Q.    Describe to me the process by which you

6    signed, then.

7         A.    When I would go for lunch at the office or

8    if I was working, he would call me and tell me to go

9    and sign some checks.

10        Q.    So based on your testimony, none of these

11   checks made out to cash went to you, right?

12        A.    Signed by me, no.

13        Q.    No, that is not my question.

14              My question is, were any of the checks

15   made out to cash that you signed using the signature in

16   Exhibit 2, did any of that money go to you?

17        A.    None of that money went to me.

18        Q.    So there should not be any checks where

19   the back of the check made to cash signed by you had

20   your signature on the back?

21        A.    That I have an understanding, no.

22        Q.    And there shouldn't be, right, if they

23   were not your money?

24        A.    It is like that.

25        Q.    Should there be any reason, Mr. Leon, why

Page 51

1    any checks using your signature should be made out to

2    Kelly Phillips?

3         A.    I don't believe it's like that.

4         Q.    Whether you believe it or not, is it your

5    testimony that you ever signed any checks to Kelly

6    Phillips.

7         A.    That I know of, no.  Every time he would

8    leave me checks, I would tell him, "I won't sign the

9    checks for me.  You sign them for me."

10        Q.    Did Mitchell or either one of the

11   companies ever loan you any money?

12        A.    No.  To me, no.

13              MS. RODRIGUEZ:  I have no other questions.

14              MR. MAMANE:  We will read.

15              (Thereupon, the taking of the deposition

16        was concluded at 12:40 p.m.,)

17

18                         EXCEPT FOR ANY CORRECTIONS

19                         MADE ON THE ERRATA SHEET BY

20                         ME, I CERTIFY THIS IS A TRUE

21                         AND ACCURATE TRANSCRIPT.

22                         FURTHER DEPONENT SAYETH NOT.

23

24                         _____

25                         WITNESS' NAME

Page 52

```
1    STATE OF FLORIDA      )

2                          )    SS:

3    COUNTY OF MIAMI-DADE)

4

5

6

7              Sworn and Subscribed to before me this

8

9    _____day of_____2010.

10

11   PERSONALLY KNOWN_____ or I.D._____

12

13    _____

14

15              Notary Public in and for the

16              State of Florida at Large.

17

18

19

20

21

22

23

24

25
```

Page 53

1                         CERTIFICATE OF OATH

2

3

4    STATE OF FLORIDA

5    COUNTY  OF  DADE

6

7              I, the  undersigned authority, certify

8    that EDEL LEON personally appeared before me and was

9    duly sworn.

10

11             Witness my hand and official seal this

12   26th day of July, 2010.

13

14                          *Melanie Simon*

15   _____

16        Melanie Simon

17        Notary Public – State of Florida

18        My Commission  CC990633

19        Expires:  1/8/13

20

21

22

23

24

25

Page 54

1              REPORTER'S DEPOSITION CERTIFICATE

2

3     STATE OF FLORIDA

4     COUNTY  OF  DADE

5

6              I, MELANIE SIMON, Certified Shorthand

7     Reporter, certify that I was authorized to and did

8     stenographically report the deposition of EDEL LEON;

9     that a review of the transcript was requested; and that

10    the transcript is a true and complete record of my

11    stenographic notes.

12             I further certify that I am not a

13    relative, employee, attorney, or counsel of any of the

14    parties, parties' attorney or counsel connected with

15    the action, nor am I financially interested in the

16    action.

17

18             DATED this 26th day of July, 2010.

19

20             _____

21                MELANIE SIMON

22

23

24

25

Page 55

```
 1                    VERITEXT FLORIDA, LLC
          BENOWITZ - BERMAN  - COOK - IVY - MATZ TRAKTMAN
 2                 Suite 1020 Biscayne Building
                      19 West Flagler Street
 3                    Miami, Florida, 33130
                        (305) 377-1514
 4                     (305) 377-1100 (fax)
 5    July 26, 2010
      Edel Leon
 6    J.H. Zidell, Esq.
      300 71st Street.
 7    Miami Beach, Florida 33140
 8
      RE        :  MELGAR VS. M.I. QUALITY
 9    DEPO OF   :  Edel Leon
      TAKEN     :  July 13, 2010
10    Number of pgs: 54
      Available for reading until:  August 27, 2010
11
12    Dear Mr. Leon,
13    This letter is to advise you that the transcript of
      your deposition is completed and is available for
14    reading and signing.
15    Please make an appointment to come to our office at
      Suite 1020, 19 West Flagler Street, Miami, Florida to
16    read and sign the transcript. Our office hours are 8:30
      a.m. to 4:30 p.m. Monday through Friday.  Depending on
17    the length of the transcript, you should allow yourself
      sufficient time for review.
18
      If the reading and signing has not been completed prior
19    to the above-referenced date, we shall conclude that
      you have waived the reading and signing of the
20    deposition transcript
21    Your prompt attention to this matter is appreciated.
22    Sincerely
23    MELANIE SIMON, Court Reporter
      cc (Copy to all counsel)
24
25
```

Page 56

```
 1                      ERRATA SHEET
 2   RE    :    MELGAR VS. M.I. QUALITY
 3   DEPO OF:    EDEL LEON
 4   TAKEN  :    7/13/10
 5      DO NOT WRITE ON TRANSCRIPT.  ENTER ANY CHANGES HERE.
 6   PAGE #      LINE #        CHANGE              REASON
 7   -----       -----    --------------------   ----------
 8   -----       -----    --------------------   ----------
 9   -----       -----    --------------------   ----------
10   -----       -----    --------------------   ----------
11   -----       -----    --------------------   ----------
12   -----       -----    --------------------   ----------
13   -----       -----    --------------------   ----------
14   -----       -----    --------------------   ----------
15   -----       -----    --------------------   ----------
16   -----       -----    --------------------   ----------
17   -----       -----    --------------------   ----------
18   -----       -----    --------------------   ----------
19   -----       -----    --------------------   ----------
20   -----       -----    --------------------   ----------
21   State of Florida)
     County of Dade )
22   Under penalties of perjury, I declare that I have read
     my deposition transcript and it is true and correct
23   subject to any changes in form or substance entered.
     here:
24

     _____        _____
25   Date                         Signature
```